# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VINCENT ANGUIANO, JR., | ) 1:07cv1875 AWI DLB HC |
| | ) |
| Petitioner, | ) FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | ) |
| | ) (Document 1) |
| JAMES A. YATES, Warden, | ) |
| | ) |
| Respondent. | ) |

Petitioner Vincent Anguiano, Jr., ("Petitioner") is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**PROCEDURAL HISTORY**

On February 5, 2004, in the Fresno County Superior Court, a jury convicted Petitioner of second degree murder by use of a deadly weapon while personally using and discharging a firearm. On May 6, 2004, he was sentenced to 15 years to life for the murder, plus 21 years for the enhancements.

Petitioner appealed to the Fifth District Court of Appeal. The court affirmed the conviction and sentence on June 22, 2005.

Petitioner filed a petition for review in the California Supreme Court, which was denied on August 31, 2005.

1    Plaintiff began his state habeas filings with a petition for writ of habeas corpus in the
2 Fresno County Superior Court. The petition was denied on November 2, 2006. His petition filed
3 in the Fifth District Court of Appeal was denied on April 5, 2007, and his petition filed in the
4 California Supreme Court was denied on October 31, 2007.

5    On December 27, 2007, Plaintiff filed the instant federal petition for writ of habeas
6 corpus in this Court. He alleges that his counsel was ineffective and that the evidence was
7 insufficient to convict him of discharging a firearm during the commission of a felony.

8    Respondent filed his answer on April 9, 2008. Respondent addresses the merits of the
9 petition, but contends that the petition was untimely filed in the first instance.

10   Petitioner filed his traverse on June 11, 2008.

## STATEMENT OF FACTS

12   Fresno Police Officer Michael Maguire testified that he was called to Las Chicas Bar at
13 approximately two o'clock in the morning on March 30, 2003. RT 338. When he arrived on
14 scene he encountered a group of people huddled around the victim, who had visible abrasions
15 "like he had been dragged around or scuffed up," and wasn't responding. RT 340. Officer
16 Maguire was responsible for the overall on-scene investigation. RT 343.

17   Justin Lozano was the security guard at Las Chicas on the night of the incident. RT 349.
18 As he was getting ready to drive home, he noticed a "bunch" of people in his rearview mirror and
19 got out of his car. RT 350. When he approached the group, they were arguing. Lozano asked
20 the group to leave and about six people jumped into a truck driven by Petitioner. RT 352-353,
21 355-356. Petitioner began driving away "slow and steady." RT 357. As he passed the bar,
22 someone threw a bottle at his truck. RT 357. Petitioner then "slammed on the brakes," as Martin
23 Lupian was running across the street, towards the truck. RT 359-360. Petitioner threw the truck
24 in reverse, crossed over one lane, traveled 40 to 50 feet, and then hit Lupian with the tailgate
25 while traveling at about 25 miles per hour. RT 361-363. Lupian tried to hold on to the tailgate
26 with both hands but he was pulled under the truck. RT 364. Both the front and rear tires ran
27 over Lupian and Petitioner continued in reverse for about 5 to 10 feet. He then put the truck in
28 drive, "burning rubber and everything," and ran over Lupian with the front tires. RT 366.

1   Everyone got out of the truck, while Lupian remained underneath. RT 366. Raul, one of the
2   owners of the bar, went up to the truck and punched out the passenger side window to get a hold
3   of the driver. RT 367, 452. It turned into a "melee" and Petitioner fought with people and pulled
4   out a gun. RT 368. Petitioner pointed the gun at everyone and started firing. RT 369. Everyone
5   began running and trying to hide. RT 369. A few minutes later, Raul returned with a gun and
6   began firing at Petitioner's vehicle while he drove away. RT 371. As he left the scene, he ran
7   over Lupian with the back tires. RT 394.

8   Lozano identified a picture of the truck at trial as the one involved in the incident. RT
9   390.

10   Della Ortiz, an owner of the bar, testified that Petitioner was not in the bar that night
11   because he was not allowed in. She saw him in the driver's seat of his truck. RT 399-400. She
12   heard a commotion and went outside, where she saw someone in Petitioner's truck arguing with
13   a person outside the bar. RT 401. She asked Petitioner if he could "take his people" and he said
14   he would. RT 402. Petitioner backed the truck up and drove off. RT 403. Someone threw a
15   beer bottle at the truck and Petitioner backed up fast. RT 405. She saw Lupian put his hands on
16   the tailgate but it knocked him down. RT 407. The truck went completely over him and then
17   stopped. AR 407. Petitioner then put the truck in forward and drove over Lupian again, coming
18   to a stop with Lupian under the truck. RT 408. She tried to get to Lupian and was able to pick
19   up his head, while others tried to get the people out of the truck. RT 409. Petitioner got out of
20   the truck and began pointing a gun at people. RT 409. He fired it two or three times up into the
21   air. RT 410. Ortiz was certain that Petitioner was the person driving the truck. RT 412.

22   The third eyewitness, Raul Robles Rodrigues, testified that he was Della Ortiz's husband
23   and co-owner of the bar. RT 425. After closing, Justin Lozano came into the bar and informed
24   Raul that there was a disturbance outside. RT 425. He went outside and saw fighting in which
25   Petitioner was involved. RT 426-427. He tried to break it up by firing three rounds into the air.
26   RT 428. He never pointed the gun at anyone. RT 429. He then made Petitioner and the others
27   get into his truck. Petitioner "burn[ed] rubber" as he drove away. RT 430. Rodrigues then saw
28   someone throw a bottle at the truck. RT 430. The truck stopped and began backing up at a high

3

1  speed and swerved across the street towards the crowd.  RT 432.  He did not see the vehicle hit
2  the Lupian the first time.  RT 432.  Rodrigues began to run and when he looked back, he saw the
3  vehicle run over Lupian, who was already on the ground.  RT 450.  He ran to the truck and broke
4  the windshield with his fist to get a hold of the driver.  RT 451-452.  The car stopped and
5  Petitioner put a gun to his face.  452.  Mr. Rodrigues ran and Petitioner began to point the gun at
6  everyone.  RT 453.  He saw the vehicle go over Mr. Lupian a third time as Petitioner drove away.
7  RT 456.

8        Fresno Police Detective Michael Harris testified that he was the lead investigator in this
9  incident.  RT 467.  He apprehended Petitioner later that morning.  He also found the gun that
10 Petitioner said he used during the incident.  RT 467-469.  He found the truck backed into a
11 corner of the property.  RT 473.  The rear tire did not match the other three and there was a bullet
12 hole just above the rear portion of the quarter panel.  RT 476.  Petitioner told Detective Harris
13 that the tire had been "shot out."  RT 477.  Detective Harris noticed "some smudging or markings
14 of some kind" on the tailgate and said that it looked like a handprint at one time of someone who
15 was gripping the tailgate "to avoid a collision" but then slipped in a downward motion off to the
16 right.  RT 478-479.  There were also some scrape marks on the undercarriage which gave "the
17 appearance of something that was recently run over."  RT 488.

18       Detective Harris further testified that he interviewed Petitioner after his arrest.  RT 493.
19 A tape of the recorded interview was played for the jury.  During the interview, Petitioner said
20 that he pulled into Las Chicas Bar and Della, who was outside, began yelling at him.  Petitioner
21 started to leave and someone hit his truck with a bottle.  He stopped the truck, everyone got out
22 and a fight started.  He said that he didn't shoot at anyone and shot up in the air twice.  He said
23 "that guy" was just laying by the truck and that someone else must have hit him because
24 Petitioner never touched him.  He also denied backing up the truck, but later said he backed up a
25 little.  RT 498-536.

26       On cross-examination, Detective Harris indicated that he did not find any clothing fibers,
27 hair, skin or blood on the underside of the truck.  RT 547.  He also indicated that fingerprint
28

4

testing was done, but because the impression was smeared, they could not determine who the prints belonged to. RT 603.

Venu Gopal, who conducted the autopsy, testified that the cause of death was complications of chest and abdominal trauma due to blunt impact. RT 721.

Jasmine Lopez, called on behalf of Petitioner, testified that he gave her a ride on the night of the incident. When they arrived at the bar, Petitioner got out and an argument started with people outside the bar. RT 677. Petitioner got back into the truck, put it in reverse and heard a loud noise, which turned out to be the window shattering. RT 678. The glass hit her face and she believed a bullet hit her leg. RT 680-681. After that, they left. RT 681. She did not recall if Petitioner hit anyone with his truck that night. RT 687.

## **DISCUSSION**

A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. Petitioner challenges his conviction imposed by the Fresno County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.   Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The AEDPA altered the standard of review that a federal habeas court must apply with respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v. Taylor, 120 S.Ct. 1495, 1518-23 (2000). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000). "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations omitted). "Rather, that application must be objectively unreasonable." Id. (citations omitted).

While habeas corpus relief is an important instrument to assure that individuals are constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal conviction is the primary method for a petitioner to challenge that conviction. Brecht v. Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993). In addition, the state court's factual determinations must be presumed correct, and the federal court must accept all factual findings made by the state court unless the petitioner can rebut "the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day, 110 F.3d 1380, 1388 (9th Cir. 1997).

C.     Statute of Limitations

As a general rule, the statute of limitations is a threshold issue to be resolved before the merits of individual claims.  See White v. Klitzkie, 281 F.3d 920, 921-22 (9th Cir. 2002). However, a federal court is not required to rule on the statute of limitations bar if the petition may be denied on other grounds.  Pough v. United States, 442 F.3d 959, 965 (6th Cir. 2006); cf. Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) (federal courts are authorized to skip a relatively complicated procedural default question and proceed to deny the claim on the merits); cf. Carr v. Cigna Securities, Inc., 95 F.3d 544, 547 (7th Cir. 1996) (choosing to "skip over the tangled statutes of limitations issues" to "come directly" to the merits of the claims).

The Court finds that the interests of the parties would be best served by avoiding what appears to be a complex statute of limitations analysis and rendering a decision on the merits of the petition

D.     Ineffective Assistance of Counsel

Petitioner contends that his trial counsel was ineffective for (1) erroneously advising Petitioner not to testify without discussing the case or consulting with him; (2) failing to properly challenge the prosecution's case; and (3) failing to conduct an investigation.

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S. 668, 687 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687.  The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances.  Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court indulges a strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

Second, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result ... would have been different." 466 U.S., at 694. Petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable. Strickland, 466 U.S. at 688. The court must evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness. Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994).

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Strickland, 466 U.S. 668, 697 (1984). Since the defendant must affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily fail. However, there are certain instances which are legally presumed to result in prejudice, e.g., where there has been an actual or constructive denial of the assistance of counsel or where the State has interfered with counsel's assistance. See Strickland, 466 U.S. at 692; United States v. Cronic, 466 U.S., at 659, and n. 25, 104 S.Ct., at 2046-2047, and n. 25 (1984).

Ineffective assistance of counsel claims are analyzed under the "unreasonable application" prong of Williams v. Taylor, 529 U.S. 362 (2000). Weighall v. Middle, 215 F.3d 1058, 1062 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [United States Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. The habeas corpus applicant bears the burden to show that the state court applied United States Supreme Court precedent in an objectively unreasonable manner. Price v. Vincent, 538 U.S. 634, 640 (2003). With this standard in mind, the Court now turns to each of Petitioner's claims of ineffective assistance of counsel.

1.      *Advice Regarding Petitioner's Testimony*

Petitioner contends that counsel erroneously advised him not to testify based on a mistaken belief that he had a prior conviction. Petitioner explains, though, that he corrected this misunderstanding by telling counsel he did not have any priors, but counsel continued to advise him not to testify. He contends that counsel made this decision without discussing the subject of Petitioner's testimony with him or testing him on cross-examination. He further explains that counsel "never visited [him] at the Fresno County Jail to discuss the facts of the case, nor did he consult with Petitioner about theories of defense." Petition, at 7. He explains that counsel "would briefly discuss issues with [him] in open court, and those discussions would usually be about the nature of the proceedings taking place." Petition, at 7.

Petitioner raised his ineffective assistance of counsel arguments in his state habeas petitions. In the only reasoned decision, the Fresno County Superior Court found that Petitioner "raised no new issues or evidence justifying his requested relief." Nov. 2, 2006, Order, at 1. The Court explained that his contentions that counsel failed to conduct an investigation, did not properly prepare for trial, and failed to subject the prosecution's case to a reliable adversarial testing were raised as part of his unsuccessful motion for a new trial and therefore should have been part of his direct appeal. As to his claim that counsel advised Petitioner not to testify without first discussing the subject of his testimony, the court explained that he could not demonstrate prejudice because "there were many witnesses to this incident." Nov. 2, 2006, Order, at 2. The Fifth District Court of Appeal and California Supreme Court did not disturb this conclusion.

The state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. First, to the extent that Petitioner believes that counsel improperly advised him not to testify based on his mistaken belief that Petitioner had a prior conviction, Petitioner states that he corrected this belief, therefore negating his own argument. That counsel made a mistake that was ultimately corrected prior to any harm resulted does not establish ineffective assistance of counsel.

1   Nor does counsel's advice not to testify, even after the misunderstanding had been
2   cleared, constitute ineffective assistance.  While Petitioner had a constitutional right to testify at
3   his trial, he effectively waived this right by not telling the court he wanted to testify.  United
4   States v. Edwards, 897 F.2d 445, 446-47 (9th Cir.1990) (holding that a defendant who silently
5   abided by his counsel's decision not to call him as a witness may not invalidate his conviction by
6   claiming he was deprived of his right to testify).  Accordingly, he cannot now claim that his
7   counsel was ineffective on this basis.

8   Petitioner also attaches an unreasonable significance to his testimony.  He states that he
9   wanted to tell "his side of the story to the jury," and would have presumably given starkly
10  contrasting testimony from the numerous eyewitnesses at the scene, all of whom gave a
11  consistent, credible version of events.  Traverse, at 11.  It is very likely that counsel anticipated a
12  cross-examination that would have highlighted these differences and perhaps cast Petitioner in an
13  even less favorable light.  A difference in opinion as to trial tactics does not constitute denial of
14  effective assistance.  United States v. Mayo, 646 F.2d 369, 375 (9th Cir.).

15  Moreover, the jury was aware of Petitioner's version of events because the prosecution
16  played the tape recording of Petitioner's interview with police.  For example, the jury heard that
17  Petitioner believed he was being attacked and shot at, and needed to flee.  RT 504.  They also
18  heard his contention that he pulled out his gun and shot up in the air because bottles were being
19  thrown at him and he was being shot at.  As to the victim, the jury heard Petitioner's contention
20  that he was already laying on the ground when Petitioner's truck was parked, and that Petitioner
21  assumed someone had knocked him out.  RT 506, 514.  He denied hitting anyone.  RT 514.

22  Therefore, because Petitioner cannot show prejudice in light of the evidence against him
23  and the cross-examination he would have likely been subject to, his claim must fail.

24      2.   *Challenges to Prosecution's Case*
25  Next, Petitioner alleges that counsel failed to meaningfully challenge the prosecution's
26  theory that Petitioner ran over the victim.  He explains that defense counsel presented two
27  defense theories- that someone else ran the victim over or, if the jury found that Petitioner did it,
28

1  it was either voluntary or involuntary manslaughter.  Petitioner contends that counsel did not
2  present any evidence to support either theory.
3       The state courts' denial of this issue was not contrary to, or an unreasonable application
4  of, clearly established Supreme Court precedent.  For example, Petitioner contends that counsel
5  did nothing to impeach the three eyewitnesses.  He is incorrect.  On cross-examination, counsel
6  asked Justin Lozano, one of the witnesses on the scene, about the difference in his demeanor at a
7  prior interview and at trial, the lighting at the scene, and discrepancies between his prior
8  statements and his testimony.  RT 372-389, 392-393.  Counsel also cross-examined Della Ortiz,
9  and inquired about inconsistencies between prior statements and her testimony and tested her
10 version of events.  RT 413-419.  Similarly, counsel tested Rodrigues' version of events on cross-
11 examination.  RT 456-464.
12      Moreover, as set forth above, the jury heard Petitioner's taped interview in which he
13 denied running over the victim and believed that someone else must have done it.  RT 499, 506.
14 Petitioner also stated that he was being attacked and threatened at gunpoint.  RT 504-507, 510-
15 523.  From this evidence and counsel's closing statement, the jury was aware of Petitioner's
16 defense.  Although the evidence was presented by the prosecution, it relayed Petitioner's story
17 without subjecting him to an aggressive cross-examination, a result likely embraced by defense
18 counsel.
19      Finally, the court instructed the jury on how to consider the evidence in determining
20 whether Petitioner was guilty of manslaughter rather than murder.  RT 828-835.
21      Insofar as Petitioner contends that counsel was ineffective for not impeaching Detective
22 Harris' testimony that fingerprinting had been done on the smear of the tailgate, but because it
23 was smeared, there was no result as to whom they belonged.  RT 603.  Petitioner believes that
24 counsel should have impeached him with an April 3, 2003, Fresno Police Department follow-up
25 report authored by D.L.DeSoto.  The reported stated that the "latents retained in this case were
26 then compared to the victim's fingerprint impressions taken at the morgue, and to the above
27 listed suspects's FPD palm cards.  The comparison results were negative."
28

1   Petitioner contends that had counsel impeached Detective Harris with this report, his
2   credibility would have been diminished.  Petitioner appears to be proceeding on the belief that
3   "negative" means an affirmative statement that the prints did not match those of either Petitioner
4   or the victim.  With this understanding, he believes that it would call into question Detective
5   Harris' opinion that the prints were so smeared that no comparison could be made.  Yet is
6   unclear whether DeSoto's statement meant that the prints were sufficient for comparison and that
7   the comparison was negative, or whether the prints could not be tested.

8   In any event, presenting this evidence to the jury would not likely have changed the
9   result.  Three eyewitnesses gave reliable testimony that they saw Petitioner hit the victim more
10  than once.  RT 361-394, 405-409, 450-456.  Two witnesses saw the victim try to hold onto the
11  tailgate before going under the vehicle.  RT 364, 407.  Petitioner cannot demonstrate that an
12  unclear statement in a third-party report would have overcome the evidence against him and
13  resulted in a different outcome.

14      3.   *Investigation*

15  Finally, Petitioner contends that counsel was ineffective for failing to hire an accident
16  reconstruction expert to review the crime scene and give an opinion in light of the totality of the
17  evidence.  He believes that "all of the forensic evidence collected circumstantially eliminated
18  Petitioner's truck as the vehicle that ran over Lupian."  Traverse, at 17.

19  The state courts' denial of this issue was not contrary to, or an unreasonable application
20  of, clearly established Supreme Court precedent.  Petitioner suggests that an expert was needed to
21  discuss the type of injuries suffered by Lupian, the damage that would have been done to the
22  truck, the significance of the absence of blood, hair, etc., from the undercarriage, and the
23  qualities of the skid marks and tire treads.  However, given the evidence against Petitioner, it is
24  unclear how an expert would have been beneficial.  There was no dispute that Lupian died from
25  complications of chest and abdominal trauma due to blunt impact, and the testimony
26  overwhelming showed that Petitioner drove the vehicle that delivered the blunt impacts.  RT 721.
27  To the extent he suggests an expert was needed to discuss the absence of blood, etc. from
28  the undercarriage, Detective Harris told the jury that he did not find any clothing fibers, hair, skin

or blood on the underside of the truck. RT 547. The possible inferences that can be drawn from this are fairly straightforward and do not require the assistance of an expert. In fact, during counsel's closing argument, he highlighted the absence of blood, skin or hair and noted how unusual the absence was given Lupian's size. RT 869. The jury was therefore presented with Petitioner's argument that he did not run over the victim, but they chose not to believe it.

Similarly, Petitioner does not demonstrate how an analysis of tire tracks would have benefitted his defense given the testimony of the three eyewitnesses. There is simply no suggestion in the record that a vehicle other than the one driven by Petitioner was involved in the incident.

C.  Sufficiency of the Evidence

Petitioner next contends that there was insufficient evidence to support the finding that he personally and intentionally discharged a firearm in the commission of a felony. Rather, Petitioner believes that the evidence demonstrates that the "acts leading to Lupian's death had occurred by the time [he] fired the weapon," and that this cannot constitution discharging a firearm "in the commission" of the murder. Petition, at 8.

The law on insufficiency of the evidence claim is clearly established. The United States Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a federal court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Sufficiency claims are judged by the elements defined by state law. Id. at 324 n. 16.

In denying his claim on direct appeal, the Fifth District Court of Appeal explained that pursuant to California Penal Code section 12022.53(c), "in the commission" of a crime does not mean that the victim has to be shot. Rather, under California law, a gun may be used "in the commission of a crime" even if the use is directed toward someone other than the victim of that crime. People v. Granado, 49 Cal.App.4th 317 (1996). The court continued:

> Thus, it is of no moment that appellant did not use the gun "against the actual victim." (*People v. Granado,* supra, 49 Cal.App.4th at p. 330.) However, the question remains: Did appellant discharge the firearm "in the commission" of the murder of which

    he stands convicted. The case of *People v. Jones*, supra, 25 Cal.4th 98 is instructive on this point.

    In *Jones*, the court addressed the following question: "[C]an the use of a deadly weapon after the completion of a sex offense constitute its use 'in the commission of' the offense for purposes of Penal Code sections 12022.3, subdivision (a), and 667.61, subdivision (e)(4)?" [footnote omitted]. Guided by its decisions in cases construing other Penal Code provisions that use the phrase 'in the commission of' or substantially similar language-specifically the provisions defining felony murder-the court concluded that "the 'commission' of a sexual offense specified in Penal Code section 12022.3, subdivision (a), does not end with the completion of the sex act, but continues as long as the assailant maintains control over the victim." (*People v. Jones, supra,* 25 Cal.4th at p. 109.)

    The court held: "[T]he legislative intent to deter the use of firearms in the commission of specified felonies requires that 'use' be broadly construed. In the case of a weapons-use enhancement, such use may be deemed to occur 'in the commission of' the offense if it occurred before, during, or after the technical completion of the felonious sex act. The operative question is whether the sex offense posed a greater threat of harm-i.e., was more culpable-because the defendant used a deadly weapon to threaten or maintain control over his victim." (*People v. Jones, supra,* 25 Cal.4th at p. 110.)

    Although here, as indicated above, at issue is what is meant by "discharge" of a firearm in the commission of an applicable offense under section 12022.3(c) rather than firearm "use" under related statutes as in *Jones*, the reasoning of *Jones* applies with equal force. Thus, to paraphrase *Jones*, the "operative question" here is whether appellant's conduct "posed a greater threat of harm ... because [appellant discharged a firearm] to threaten or maintain control over the victim." (*People v. Jones, supra,* 25 Cal.4th at p. 110.)

    From the evidence, the court reasonably could have concluded as follows: Appellant ran his vehicle over the victim twice. After the second time, appellant came to a stop and the victim, who was still alive, was lying on the ground under appellant's vehicle. At that point, Lozano, who was trying to come to the victim's aid, and several other persons approached appellant and his cohorts. In the melee that ensued, some persons were attempting to prevent appellant from leaving the scene. However, appellant pulled out a handgun and started firing, at which point Lozano and the others who had converged on appellant were forced to run for their lives. This enabled appellant to get back in his truck and drive off, running over the victim a third time in the process. The victim died approximately eight hours later.

    Based on the forgoing, the court reasonably could have concluded that appellant discharged the firearm in order to frighten Lozano and the others into retreating, thereby enabling appellant to "maintain control over the victim." (*People v. Jones, supra,* 25 Cal.4th at p. 110.) Therefore, substantial evidence supported the court's finding that appellant discharged a firearm "in the commission of" the murder of which he stands convicted. (§ 12022.53(c).)

People v. Anguiano, 2007 WL 1460307, *3-4 (2005).

    The state courts' decision was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Insofar as Petitioner is challenging the court's definition of "in the commission," this Court must accept state court interpretation of state law. Lewis v.

Jeffers, 497 U.S. 764, 780 (1990) (federal habeas court must respect a state court's application of its own law and must not engage in *de novo* review).

If Petitioner accepts this definition but challenges the sufficiency of the evidence, his argument also fails. Petitioner does not explain why he believes that the evidence was insufficient to find that he used his gun in the commission of the offense. Nonetheless, the evidence, when viewed in a light most favorable to the prosecution, could have led a rational trier of fact to find the essential elements of the enhancement beyond a reasonable doubt. Numerous witnesses saw Petitioner hit Lupian with his truck. As others came to assist Lupian and attempt to get Petitioner out of the truck, Petitioner, with Lupian still under the truck, got his gun and began pointing it at the crowd. As a result, the individuals in the crowd ran from the truck and Petitioner was able to drive over Lupian again as he left the scene. RT 366-394, 407-412, 450-456. From this evidence, a jury could certainly conclude, beyond a reasonable doubt, that Petitioner's "conduct 'posed a greater threat of harm ... because [[he] discharged a firearm] to threaten or maintain control over the victim." People v. Jones, 25 Cal.4th 98, 110 (2001).

Petitioner's argument is without merit and should be denied.

## RECOMMENDATION

For the reasons discussed above, the Court HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii, United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the

specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **November 15, 2008**          /s/ **Dennis L. Beck**
                                     UNITED STATES MAGISTRATE JUDGE